## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

**BARBARA PALAU,** )
    Plaintiff, )   Civil Action No. 2:08cv00051
      )   **MEMORANDUM OPINION**
      )
v. )
**MICHAEL J. ASTRUE**, )
**Commissioner of Social Security,** )   By: GLEN M. WILLIAMS
    Defendant. )   SENIOR UNITED STATES DISTRICT
      )   JUDGE

    In this social security case, the court affirms the final decision of the Commissioner denying benefits.

### I. Background and Standard of Review

    The plaintiff, Barbara Palau, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 1381 *et seq*. (West 2003 & Supp. 2008). This court has jurisdiction pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3).

    The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as

Case 2:08-cv-00051-GMW-PMS Document 17 Filed 06/08/09 Page 1 of 44 Pageid#: 72

"evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Palau protectively filed her current application for SSI on March 17, 2004, alleging disability as of October 20, 2002, due to fibromylagia, chronic pain, nerve damage in the hands, bipolar disorder, chronic pain in the hips and back, anxiety and post traumatic stress disorder. (Record, ("R."), 53-56, 63.) The claim was denied initially and upon reconsideration. (R. 37-40, 43-46.) Palau then requested a hearing before an administrative law judge, ("ALJ"), on August 29, 2005. (R. at 47-49.) The ALJ held a hearing on June 29, 2006, at which Palau was represented by counsel. (R. at 837-860.)

By decision dated July 24, 2006, the ALJ denied Palau's claim. (R. at 13-24.) After consideration of the entire record, the ALJ found that Palau had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 18.) The ALJ found that the medical evidence established that Palau had severe impairments, namely post traumatic stress disorder, ("PTSD"), bipolar disorder, generalized anxiety disorder, borderline personality disorder, substance abuse disorder, degenerative disc disease, ("DDD"), of L5-S1, obesity and fibromyalgia, but he found that Palau's medically determinable impairments did not meet or medically equal one of the impairments listed at 20 C.F.R. § Part 404, Subpart P, Appendix 1. (R. at 18-19.) The ALJ found that Palau maintained the residual

2

functional capacity to perform the requirements of medium[1] work, whereby she could lift up to 50 pounds occasionally, 25 pounds frequently, sit, stand, and/or walk for up to six hours for each activity and no more than occasionally balance. (R. at 22.)  Additionally, the ALJ found that Palau was seriously limited but not precluded in her ability to relate to co-workers, relate to the general public, interact with supervisors and deal with stress; however, the ALJ found that Palau had a limited but satisfactory ability to maintain attention and concentration and understand, remember and carry out simple instructions.  (R. at 22.)  The ALJ determined that Palau was unable to perform any past relevant work.  (R. at 26.)  Based on Palau's age, education and work history, as well as the testimony of a vocational expert, the ALJ determined that Palau was capable of performing a significant number of jobs existing in the national economy, such as work as a laundry worker or production worker.  (R. at 27.)  Thus, based on these findings, the ALJ determined that Palau was not under a "disability" as defined by the Act and was not eligible for SSI benefits.  (R. at 27.)  *See* 20 C.F.R. § 416.920(g) (2008).

After the ALJ issued his decision, Palau pursued her administrative appeals but the Appeals Council denied her request for review on July 21, 2008.  (R. at 6-9.)  Palau then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision.  *See* 20 C.F.R. § 416.1481 (2008).  The case is before this court on Palau's motion for summary judgment filed February 16, 2009, and on the Commissioner's motion for summary judgment filed July 13, 2006.

---

[1] Medium work involves lifting items weighing up to 50 pounds with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, she also can do light work or sedentary work.  *See* 20 C.F.R. § 404.1567(c) (2008).

3

## II. Facts

Palau was born in 1965, (R. at 60), which classifies her as a "younger person" under 20 C.F.R. § 416.963(c). Palau has a high-school education, (R. at 208, 416), and past work experience as a day care teacher, factory worker and receptionist. (R. at 69.)

At the hearing, Palau stated that she worked in a factory, through rehabilitative services, for about six months in 2002, a job which consisted of "put[ing] book covers on books and put[ing] bottles in boxes. (R. at 841.) Palau testified that she worked only approximately 40 hours over the six-month period due to illnesses and medical appointments. (R. at 842.) Palau also stated that she worked in a methadone clinic as a receptionist, which consisted of "a couple hours [a day] real early in the morning." (R. at 842.) Palau explained that she also was a receptionist for a landscape company, whereby she answered phone calls regarding mulch sales. (R. at 843.) Palau testified that she was also a day care teacher from 1981 to 1987. (R. at 843.)

Palau stated that she had a mild heart attack and, as a result, began seeing a specialist. (R. at 833-34.) Palau testified that she was forced to discontinue these visits because her insurance was terminated. (R. at 844.) Palau explained, however, that she continued to get heart medication from her doctor. (R. at 844.) Palau stated that she has a lifelong history of migraine headaches, which she is unable to control with medication. (R. at 844.)

4

Palau explained that her migraines have been exacerbated by head and neck trauma stemming from multiple incidents. (R. at 845.) Palau testified that she had been in three car accidents whereby her "head was put through the windshield." (R. at 845.) In addition, Palau stated that when she was young, "part of a top of a tree [fell] on [her] head and neck." (R. at 845.) Palau also noted that her ex-husband "used to beat [her] and knock [her] out" which resulted in her "head hit[ting] the table." (R. at 845.) Palau further noted that she once "fell off [a] diving board and landed on the cement headfirst," resulting in additional head and neck trauma. (R. at 845.)

Palau explained that she also suffered from bi-polar disorder, for which she takes medication. (R. at 845.) Palau noted that the medication "helps some." (R. at 845.) Palau testified that she had physical pain all the time in her back, hips, lets, feet and hands. (R. at 846.) She stated that the pain in her back, hips and legs was exacerbated by periods of prolonged standing, walking or sitting. (R. at 846.) In addition, Palau noted that she could not lie down flat, but rather must sleep at an angle. (R. at 846.)

Palau testified that she lived in a house with her 19-year old, disabled son who received supplemental security income. (R. at 847.) Palau explained that she paid rent by using her son's supplemental security income. (R. at 847.) Palau described her typical day, stating that she gets up early, after sleeping only a few hours at a time due to her pain. (R. at 847.) Palau explained that she usually went to bed around 2:00 a.m. or 3:00 a.m. and that she slept until around 6:00 a.m. or 7:00 a.m. (R. at 847.) Palau noted that she would lie down throughout the day, but never for more than a few hours. (R. at 847.)

5

Palau explained that, when sitting, she leaned on her left arm due to her back pain. (R. at 848.) Thus, Palau noted that she could not use her left arm while sitting. (R. at 848.) Palau testified that it would be very difficult for her to sit up straight for an eight hour period and use both hands. (R. at 849.) Palau noted that she could do little things, such as sit at and use a computer, but only for a few minutes because she had surgery on her hands in the past. (R. at 849.)

With regard to her migraines, Palau explained that they occur every morning. (R. at 850.) Palau also testified that she had a herniated disc in her lower back, in addition to having problems with her upper back and knees. (R. at 850.) Although she had been taking numerous medications, Palau noted that she currently took Lortab. (R. at 850.) Palau further noted that she did not normally sit without leaning up against something, noting she usually sat at a table. (R. at 851.) She stated that she used a cane to stand, and could only stand without the cane for no more than three to five minutes. (R. at 851.) Palau explained that she was prescribed a walker after falling the previous year, spraining her hip, knee and leg; however, she purchased the cane because it was embarrassing to use a walker at her age of 40. (R. at 851-52.) Palau also noted that she could only walk very short distances without the cane, as the cane's primary function was to help her balance. (R. at 853.)

When asked how much she could lift or carry, Palau stated that she did not know, but that she could do things such as lift a gallon of milk out of the refrigerator and pour it, but she explained that she could not "carry it like [she] used to." (R. at 853.) Palau also noted that she took medication for her mood

6

swings, which she stated occur very often. (R. at 854.) Palau explained that her mood swings from very high to very low. (R. at 854.) Palau further stated that she did not "go anywhere except where [she had] to go," and that she did not "like people coming to [or calling her] house." (R. at 854.)

William Ellis, a vocational expert, was present and testified at Palau's hearing. (R. at 855.) Ellis classified Palau's past relevant work as a sales clerk and an assembler as light;[2] her work as a receptionist as sedentary;[3] and her work as a child monitor as heavy.[4] (R. at 856.) Palau was asked to consider a hypothetical individual of Palau's age, education and work history who could perform medium work that required only occasional balancing, and would be limited, but not precluded, in her ability to relate to co-workers, the public, supervisors and in her ability to deal with stress; however, her ability to maintain concentration and her ability to understand, remember and carry out simple instructions would be limited, but satisfactory. (R. at 856.) Ellis testified that such an individual could perform work as a laundry worker, which had 600 regional jobs and 36,000 jobs nationwide, as well as a production worker, which had 3,200 regional jobs and 145,000 jobs nationwide. (R. at 856.) Ellis additionally stated that such jobs are

---

[2] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can perform light work, she also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2008).

[3] Sedentary work involves lifting up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. 20 C.F.R. § 404.1567(a), 416.967(a) (2008).

[4] Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work. *See* 20 C.F.R. § 404.1567(d), 416.967(d) (2008).

7

reduced 10 percent to accommodate the limitations in the ALJ's hypothetical. (R. at 856.)

Ellis was next asked to consider the same individual who could do light work with the same restrictions, who was limited to no more than occasional balancing. (R. 857.) In addition, the psychological restrictions would be the same, except she would have a sit/stand option every 45 minutes and be limited to low stress jobs. (R. at 857.) Ellis stated that such an individual could perform jobs as a packer which had 2,700 regional jobs and 176,000 jobs nationwide, as well as a parking lot attendant, which had 400 regional jobs and 36,000 jobs nationwide. (R. at 857.) Ellis additionally noted that such jobs are reduced 10 percent to accommodate the limitations in the ALJ's hypothetical. (R. at 857.) The ALJ asked Ellis whether Palau could do her prior work, should her testimony be believed, to which Ellis responded she could not. (R. at 857.)

Ellis was next asked to consider the same individual who could do sedentary work with a sit/stand option every 45 minutes, perform only low stress jobs that required no more than occasional balancing, and who had the same psychological restrictions as the two prior hypotheticals. (R. at 858.) Ellis stated that such an individual could perform work as a production worker, which had 1,000 regional jobs and 48,000 jobs nationwide; a packer, which had 150 regional jobs and 11,000 jobs nationwide; and an assembly worker, which had 1,100 regional jobs and 53,000 jobs nationwide. (R. at 858.) Ellis again noted that such jobs are reduced 10 percent to accommodate the limitations in the ALJ's hypothetical. (R. at 858.)

8

The ALJ asked Ellis to consider the same hypothetical individual, except that he changed the psychological restriction of maintaining attention and concentration to severely limited but not precluded. (R. at 858.) Ellis stated that there would be no jobs for such an individual. (R. at 858.) Palau's attorney asked Ellis to consider the same hypothetical individual, but who also had to lean on their left non-dominant arm when they were sitting. (R. at 858.) Ellis stated that such a restriction would impact their ability to perform the jobs listed because, even though it is the non-dominant arm, the individual would need it for guidance. (R. at 859.) Ellis opined that such an individual could probably do the work in the sedentary range, could lift with the right arm and maybe perform the job of a packer at the light exertional level. (R. at 859.) However, Ellis stated that the left arm would be needed for guidance. (R. at 859.) Ellis further opined that if such an individual could not use the arm at all, they still could possibly perform work as a parking lot attendant, which would not require the left arm. (R. at 859.) Ellis additionally stated that if an individual had to use a cane in the right hand while standing, it would be very difficult to perform the listed jobs. (R. at 859.)

In rendering his decision, the ALJ reviewed records from Harrisonburg-Rockingham Community Services Board; Edward Ross, Ph.D., a state agency psychologist; Dr. Mark A. Vollenweider, M.D.; Jeanne M. Bennett, Psy.D.; Dr. Mark V. Burns, M.D.; Cumberland River Comprehensive Care Center; Dr. A. Dahhan, M.D., F.C.C.P.; Dr. James T. Ramsey, M.D., a state agency physician; Ed Stodola, Ph.D., a state agency physician; Dr. Sharon Colton, M.D.; Mountain Comprehensive Health Corporation; Carilion Family Medicine; Harlan Appalachian Regional Healthcare, Inc.; Dr. Bruce T. Wilson, M.D.; Indian Path

Pavilion; Dr. Nuveed Loqman, M.D.; and Paul M. Manning, D.O. Palau's attorney submitted additional medical evidence to the Appeals Council.[5]

Palau received mental health treatment at Harrisonburg-Rockingham Community Services Board from October 3, 2000, through November 19, 3002, with complaints of posttraumatic stress disorder, ("PTSD"), dissociative episodes, auditory hallucinations, borderline personality disorder, eating disorder, obsessive compulsive disorder, bipolar disorder, self-mutilating behavior, polysubstances abuse in remission, history of childhood sexual abuse, flashbacks, nightmares, anger issues, panic attacks, depression, paranoia, anxiety, parenting problems, irritability, sleep disturbance and crying spells. (R. at 302-323.)

On September 15, 2004, Edward Ross, Ph.D., completed a Psychiatric Review Technique on Palau in which he concluded that there was insufficient evidence to make a medical disposition. (R. at 324-338.)

On September 18, 2004, Palau presented to Dr. Mark A. Vollenweider, M.D., of the Division for Disability Determination, for a consultative examination, with complaints of fibromyalgia, chronic back pain and arthritis. (R. at 339.) Dr. Vollenweider noted that Palau had a history of multiple vehicle accidents in 1991, which resulted in significant damage to her hands to the point where she was unable to grip various objects. (R. at 339.) Dr. Vollenweider also noted that Palau had applied for disability following this string of accidents, only to be denied and

---

[5]Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 5-7), this court also will consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

10

returned to work where she was forced to deal with the pain. (R. at 339.) Dr. Vollenweider also noted that Palau reapplied for disability in 2001 with similar complaints, in addition to being diagnosed with borderline personality disorder, bipolarism and panic attacks, only to be denied again. (R. at 339.) Palau noted at this time that she attempted to commit suicide by overdosing on medication, and had been seeing a psychiatrist. (R. at 339.)

Dr. Vollenweider noted that Palau had significant pain in her hands, in addition to complaints of poor sleep, anhedonia and suicidal ideation. (R. at 340.) Palau stated that she had difficulty leaving the house, in addition to feeling as though people were watching her. (R. at 340.) Palau also explained to Dr. Vollenweider that she suffered from insomnia, noting that she could only sleep two to three hours per night. (R. at 340.) She also indicated that she suffered from chronic back pain, stating that she had herniated three discs in her lumbar spine. (R. at 340.) Palau reported osteoarthritis in her hips and ankle, in addition to having carpal tunnel, resulting in decreased grip strength. (R. at 340.) Palau also reported that she had been diagnosed with fibromyalgia, for which she was on psychiatric and pain medication. (R. at 340.)

Dr. Vollenweider noted that Palau was currently taking Lithium, Xanax, Seroquel, Flexeril, Fiorinal, Nitroglycerin, Clindamycin, Flonase, Prilosec and Percocet. (R. at 340.) A review of systems revealed that Palau had a myocardial infarction for which she was prescribed nitroglycerin. (R. at 341.) Palau stated that she had occasional chest pain, in addition to shortness of breath, cough and chronic morning sputum. (R. at 341.) A neurologic and psychiatric review revealed that Palau complained of having borderline personality and bipolar

11

disorder, in addition to having episodes of mania, depression and anhedonia. (R. at 341.)

A physical examination revealed Palau's blood pressure was at 140/90, her respiratory rate was at 18, her vision was 20/25 bilaterally, her chest was clear to auscultation, with no rales, rhonchi or weezing, and her heart had regular rate and rhythm, with no murmers, gallops or rubs. (R. at 341-42.) An examination of the abdomen revealed severe truncal obesity, soft, nondistended and nontender, with positive bowel sounds, no guarding or rebound. (R. at 342.) An examination of the extremities revealed that Palau's grip strength was three out of five with bilateral carpal tunnel release scars visible, and bilateral knees demonstrated osteoarthritis with positive McMurray sign. (R. at 342.) Dr. Vollenweider noted that Palau had normal range of motion in shoulders, in addition to flexion, abduction, internal rotation and external rotation. (R. at 342.) Additionally, Palau had hip flexion of 60 degrees bilaterally, lumbar spine flexion and extension of 80 degrees and straight leg flexion of 45 degrees bilaterally. (R. at 342.) Dr. Vollenweider noted that Palau had symptoms consistent with fibromyalgia, with painful trigger points in the shoulders, elbows, wrists, midline cervical spine, knees and hips. (R. at 342.)

In his overall assessment, Dr. Vollenweider noted no limitations in Palau's hearing, seeing and traveling. (R. at 343.) Dr. Vollenweider also stated that Palau's symptoms of carpal tunnel syndrome would limit her ability to lift and carry objects. (R. at 343.) Dr. Vollenweider noted, with regard to sitting, standing and walking, that Palau would have some mild difficulty secondary to lumbar spine pain. (R. at 343.) In terms of mental functioning, Dr. Vollenweider noted

that Palau had no limitations understanding, remembering and carrying out simple instructions, but that there would be some significant limitations responding to co-workers, supervisors and work pressures. (R. at 343.) However, Dr. Vollenweider noted that Palau's psychiatric disorders needed to be addressed by a qualified psychologist or psychiatrist. (R. at 343.)

On March 6, 2005, Palau underwent a consultative examination by Jeanne M. Bennett, Psy.D., at the Department for Disability Determinations. (R. at 345.) Bennett noted that Palau's medical history was remarkable for chronic neck and back pain, herniated L4-L5 discs, nerve damage in both hands, chronic migraines since childhood, fibromyalgia with myofascial pain, hypertension, cardiac disease, hyperlipidemia, arthritis, asthma and acid reflux. (R. at 346.) Bennett additionally noted that Palau had closed head injuries from three motor vehicle accidents, in addition to head injuries sustained from falling off a tree at age 11 and a diving board at age 13. (R. at 347.) Bennett also noted that Palau had a history of mental health treatment, whereby she complained of suicidal ideation, auditory and visual hallucinations, as well as self-mutilation. (R. at 347.) Bennett further noted that Palau denied any history of alcohol or substance abuse. (R. at 348.)

Bennett noted that Palau slept an average of five to six hours per night, with frequent awakenings due to her pain. (R. at 348.) Palau required a chair to take a shower, but otherwise was independent in performing hygiene and grooming tasks. (R. at 348.) In addition, Palau did very little housework, no yard work, grocery shopped twice per month and watched television and wrote poetry in her free time. (R. at 348.)

13

A mental status examination and behavioral observation revealed that Palau ambulated slowly but independently, with no psychomotor disturbances. (R. at 348.) Bennett found that Palau's attention and concentration were good and that she was oriented in all spheres. (R. at 349.) Palau was able to recall three of three words immediately following presentation and one of three words after a 15 minute delay. (R. at 349.) Palau rated her mood as six to seven on a 10-point scale, and she elaborated that she generally had manic episodes rather than depressive episodes. (R. at 350.) It was noted that Palau's speech was fluent and normal with respect to tone and volume, her thoughts were logical, coherent and goal directed and there was no evidence of paranoid ideation or delusional thinking, as well as no indications of a formal thought disorder. (R. at 350.) Bennett noted that Palau's general information, as well as global intellectual functioning, were estimated to be in the average range. (R. at 351.) In addition, Palau's judgment was assessed as fair, she demonstrated limited capacity for insight regarding her behavior and she appeared capable of making decisions for herself independently. (R. at 351.) Palau stated that she was stressed daily by thoughts of her daughter, who was in a witness protection program, as well as by thoughts of her son's disabilities. (R. at 351.)

Palau was diagnosed with bipolar disorder, mixed, borderline personality disorder, status post closed head injuries and three MVAs, hypertension, status post myocardial infarction with a Global Assessment of Functioning, ("GAF"), of

14

50.[5]  (R. at 352.)  Bennett opined that Palau's ability to tolerate stress and the pressure of day-to-day employment was affected, with marked limitations noted; her ability to sustain attention and concentration towards the performance of simple repetitive tasks was affected, with moderate limitations noted; and her capacity to respond appropriately to supervision and co-workers in a work setting was affected by the impairment with marked limitations noted.  (R. at 352.)

On March 11, 2005, Palau underwent a consultative examination by Dr. Mark V. Burns, M.D., of the Department for Disability Determination, for complaints of fibromyalgia causing pain in the back, neck, knees, foot, hand, hips and ankles, as well as bipolar disorder and PTSD.  (R. at 353.)  Palau noted that her pain was exacerbated with prolonged sitting, standing, bending, twisting, turning, stooping and squatting.  (R. at 354.)  A physical examination revealed blood pressure at 120/80; a clear chest to auscultation in all lobes with no rales, rhonchi or wheezing; a regular heat rate without murmers, gallops, clicks or rubs; a soft and nontender abdomen with bowel sounds present; no clubbing, cyanosis or edema in the extremities, with no deformities, redness or tenderness noted; and no evidence of scoliosis, tenderness or spasms noted, and a straight leg rise of 90 degrees in both the sitting and supine positions bilaterally.  (R. at 354.)

Dr. Burns opined that, based on the medical findings, Palau had the ability to perform activities involving sitting, standing, moving about, lifting, carrying, handling objects, hearing, seeing, speaking and traveling.  (R. at 355.)  Dr. Burns

_____

[5] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 41-50 signals an individual has "serious symptoms or serious impairments in social, occupational or school functioning."  DSM-IV at 32.

noted that her physical examination and orthopedic examination were within normal limits. (R. at 355.) Dr. Burns further noted that Palau had normal gait and station without evidence of motor dysfunction, sensory loss or reflex abnormalities. (R. at 355.) He also noted that Palau did not use a cane or assistive device for ambulation, she had the ability to hear and understand normal conversational speech and had normal gross manipulation and grip strength. (R. at 355.)

Palau received mental health treatment at Cumberland River Comprehensive Care Center from December 2, 2004, through April 18, 2005. (R. at 358-386.) The treatment notes reveal that Palau suffered from many different ailments, including anxiety disorder, depression, mood disorder, poor insight, a history of physical and sexual abuse, PTSD, stress, anger issues, bipolar disorder, schizo-affective disorder, borderline personality disorder, nervousness, auditory hallucinations, sleep disturbance, crying spells, nightmares, recurrent thoughts, a history of suicide attempts, self-mutilation, cannabis dependence and poor memory.[6] (R. at 358-386.)

On May 19, 2005, Palau presented to Dr. A. Dahhan, M.D., F.C.C.P., for an x-ray of the hip and knee. (R. at 387.) The x-ray of Palau's hip showed minimal degenerative changes of the left hip with no other abnormalities, while the x-ray of the knee was negative. (R. at 387.)

On June 8, 2005, Dr. James T. Ramsey, M.D., completed a Physical Residual Functional Capacity Assessment, ("PRFC"), in which he opined that

[6] The treatment notes from these visits are largely illegible. (R. at 358-386.)

Palau could occasionally lift and/or carry a maximum of 50 pounds; frequently lift and/or carry a maximum of 25 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; and that she was unlimited in her ability to push and/or pull. (R. at 389.) Dr. Ramsey imposed no postural, manipulative, visual, communicative or environmental limitations. (R. at 390-92.) Dr. Ramsey opined that Palau's allegations of multiple areas of musculoskeletal pain should only be given partial credibility based on the objective clinical findings. (R. at 393.)

In rendering this opinion, Dr. Ramsey noted that Palau had a diagnosis of fibromyalgia with pain in her back, neck, foot, hand, hip and angle. (R. at 389.) Dr. Ramsey further noted that x-rays in Palau's file showed mild osteophytes in the dorsal spine area with no fractures, and her lumbar spine was normal, except for a questionable narrowing of the L5-S1 disc space. (R. at 389.) Dr. Ramsey additionally noted that Palau was neurologically intact and straight leg raising sign was negative bilaterally. (R. at 390.) Palau's gait was described as normal, although she alleged prolonged sitting, standing, bending, twisting, turning, stooping and squatting as exacerbating the pain. (R. at 390.)

On March 30, 2005, Ed Stodola, Ph.D., completed a Mental Residual Functional Capacity Assessment, ("MRFC"), in which he opined that Palau was not significantly limited in her ability to remember locations and work-like procedures, understand and remember very short and simple instructions, understand and remember detailed instructions, carry out very short and simple instructions, sustain an ordinary routine without special supervision, make simple work-related decisions, ask simple questions or request assistance, get along with

17

co-workers or peers without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, to be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation and to set realistic goals or make plans independently of others. (R. at 397-98.)

Stodola found that Palau was moderately limited in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, work in coordination with or proximity to others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors and respond appropriately to changes in the work setting. (R. at 397-98.) In addition, Stodola opined that Palau was mentally unable to function in a competitive work setting with adequate effectiveness, persistence and socialization. (R. at 399.) He further opined that Dr. Bennett's were consistent with his conclusion and assigned it great weight in making his assessment. (R. at 399.)

On March 30, 2005, Stodola also completed a Psychiatric Review Technique form, ("PRTF"), in which he noted that Palau had a moderate degree of limitation in her restriction of activities of daily living and with her difficulties in maintaining social functioning; a marked degree of limitation in her difficulties in maintaining

concentration, persistence or pace; and one or two degrees of limitation with her episodes of decompensation, each of extended duration. (R. at 401-411.)

On July 6, 2005, Stodola re-evaluated Palau and completed another MRFC in which he made identical findings to his earlier MRFC, except in his re-evaluation he opined that Palau was not significantly limited in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, work in coordination with or proximity to others without being distracted by them and accept instructions and respond appropriately to criticism from supervisors. (R. at 416-17.)

Stodola additionally stated that Palau's mental allegations alone were partially credible, with restrictions that were severe but not disabling. (R. at 418.) He also observed that functional information indicated that emotional liability may interfere with sustaining attention and completing tasks. (R. at 418.) He additionally noted that Palau drove, shopped, provided for her own self-care, enjoyed a number of activities and performed some routine tasks. (R. at 418.) Stodola opined that Palau was mentally able to understand, remember, and carry out simple and detailed instructions for two hour segments over an eight hour period; relate adequately in object focused settings; and adapt to the changes and pressures of a routine setting. (R. at 418.) Stodola further opined that the severity indicated by Dr. Bennett's opinion regarding stress tolerance and social functioning was not supported by the evidence related to discrete mental allegations, and thus, such an opinion would be assigned little weight. (R. at 418.)

On July 6, 2005, Stodola completed another PRTF in which he made identical findings to his previous PRTF, except in his re-evaluation he noted that Palau had a mild degree of limitation in her restriction of activities of daily living (R. at 420-432.)

On April 27, 2004, Palau presented to her treating physician, Dr. Sharon Colton, M.D., for a routine follow-up after being in the hospital. (R. at. 464-65.) Palau complained of many ailments, including pain in her left temple, infected cysts, fibromyalgia and chronic pain in her back and neck. (R. at 464.) Palau was diagnosed with multiple boils, fibromyalgia, migraine headaches, bipolar disorder, chronic neck pain, asthma, gastroesophageal reflux disease, ("GERD") and arteriosclerotic heart disease, ("ASHD"). (R. at 465.) Dr. Colton prescribed her with Keflex, Fiorinal, Seroquel, Prilosec OTC, Lithium Carbonate, Flexeril and Xanax. (R. at 465.) From June 2, 2004, to July 15, 2004, Palau presented to Dr. Colton with complaints of trauma to her ankle suffered from a fall, as well as an infected cyst on her left breast. (R. at 461-63.)

On July 28, 2004, Palau presented to Dr. Colton for a comprehensive medical examination. (R. at 456.) A review of systems revealed reports of chest pain, but often resulting from panic, coughing, heartburn, constipation, neck and back pain, cysts on her breasts, restlessness and reports of breaking out in cold sweats. (R. at 456.) Dr. Colton noted that Palau had a past history of fibromyalgia, migraine headaches, bipolar disorder, chronic neck pain, asthma, tobacco use disorder, GERD, ASHD, hyperlipidemia, hidradenitis supperativa, glucose intolerance and dec vision. (R. at 456-57.) Among her observations, Dr. Colton noted that Palau was a well-developed, morbidly obese white female in no

20

acute distress. (R. at 458.) Dr. Colton made further notations that Palau had some scarring on her skin, normal hair, nails, vision and hearing, a clear nose and mouth, no nipple abnormality, a regular heart rhythm, clear lungs to auscultation and percussion, an obese abdomen with generalized mild tenderness, normal bowel sounds, normal gait and station, no lymphadenopathy in cervical, axillary or injuinal areas, no amputations or deformities and a normal mood and affect. (R. at 458-59.) Dr. Colton made no diagnoses regarding any of her problems, however, she did make the following therapeutic recommendations: regarding her bipolar disorder, PTSD or anxiety, Dr. Colton recommended that Palau see a psychiatrist; regarding her asthma and tobacco use disorder, Dr. Colton encouraged Palau to cease smoking.; regarding her GERD, Dr. Colton recommended the continued use of Prilosec; regarding her ASHD, hyperlipidemia and glucose intolerance, Dr. Colton stressed the importance of moderation in sodium intake, saturated fat and cholesterol and caloric balance; regarding her hidadrenitis supperrativa, Dr. Colton recommended Keflex for 10 days with two refills; and regarding her dec vision, Dr. Colton encouraged an appointment with an eye care provider. (R. at 459-60.)

From August 24, 2004, to November 8, 2005, Palau presented many times to Dr. Colton. (R. at 437-54, 575-82.) During these visits, Dr. Colton assessed Palau's major problems as including influenza, tobacco use disorder, fibromyalgia, migraine headaches, bipolar disorder, chronic neck pain, asthma, GERD, hyperlipidemia, glucose intolerance, low back pain, sacroiliac joint dysfunction, constipation, dermatitis, left breast pain, shortness of breath, chest pain, hypertension, anxiety and right knee pain. (R. at 437-54, 575-82.) On March 6, 2006, Palau had an x-ray of her lumbar spine which revealed a severe narrowing of

the L5-S1 disc interspace, compatible with degenerative disc disease. (R. at 580.) No lumbar compression fracture was identified. (R. at 580.)

Palau received treatment at Mountain Comprehensive Health Corporation from September 14, 2005, through January 5, 2006, with complaints of methicillin resistant staphylococcus aureus, ("MRSA"), skin infections, high triglyceride, hypertension, migraine headaches, bipolar affective disorder, recurrent folliculitis, arthritis, chronic pain syndrome, neck pain radiating to the left arm, obesity, tobacco use, hyperthyroidism, diabetes, low hygiene, COPD and heart disease. (R. at 466-483, 574.) During these treatments, Palau was prescribed Ultracet, Endocet, Albuterol, Clindamycin, Bactrim, Motrin and Flexeril. (R. at 466-483, 574.) On September 29, 2005, Palau had an x-ray which revealed discoid atelectasis in the lower lobes; heart size within normal limits; no pleural effusion; no acute infiltrates; mild degenerative changes in the thoracic spine; and overall, no acute cardiopulmonary disease was noted. (R. at 483.)

Palau received treatment at Cumberland River Comprehensive Care Center from September 19, 2005, through July 3, 2006, with complaints of depression, social isolation, manic episodes, paranoia, a history of self-mutilation, difficulty dealing with stress, interpersonal relationship problems and random suicidal thoughts. (R. at 485-89, 569-72.)

Palau received treatment at Carilion Family Medicine from December 14, 2000, through September 28, 2002. (R. at 491-526.) Palau received treatment for the following ailments and complaints: rash, tobacco use, migraine headaches, swelling on inner upper thigh, carbuncle, back pain, fatigue, pain all over her body,

fibromyalgia, hidradenitis, bipolar affective disorder, obesity, cellulitis, abscess under her right arm and boils underneath her breasts. (R. at 491-526.) Among the medications prescribed to her during this time included Keflex, Propranolol, Fiorinal, Lithium Carbonate, Seroquel, Xanax, Vioxx, Nystatin, Tylox, Vicodin, Maxide, Daypro, Zyprexa, Zoloft, Norflex and Prevacid, in addition to being prescribed physical therapy. (R. at 491-526.)

Palau was admitted to Harlan Appalachian Regional Healthcare, Inc., ("Appalachian"), from March 31, 2004, through April 2, 2004, after reporting to the Emergency Room for migraine headaches and chest pains after being given Imitrex. (R. at 552.) Palau's electrocardiogram, ("ECG"), showed evidence of an old myocardial infarction. (R. at 552.) Palau's creatine phosphokinase, ("CPK"), was normal, however her troponin I was in the gray zone. (R. at 552.) Palau had a cardiac catheterization but understood that she had no blockages. (R. at 552.) It was noted that Palau had a past medical history of arteriosclerotic heart disease, status post myocardial infarction, migraine headaches, fibromyalgia, bipolar disease, hyperlipidemia, a history of peptic ulcer disease and GERD and chronic back pain. (R. at 552.) Palau's then current medications included Lithium, Seroquel and Xanax. (R. at 553.) Palau's final diagnoses upon being discharged included chest pain, with a history of myocardial infarction, but no evidence of myocardial ischemia, hyperlipidemia, fibromyalgia and chest wall pain, GERD, migraine headaches and bipolar disorder. (R. at 554.)

On May 19, 2004, Palau presented to Appalachian for an ECG, which showed evidence of a possible old anterior infarction. (R. at 547.) On June 1, 2004, Palau presented to Appalachian with complaints of right hip pain, right foot

23

and ankle and swelling secondary to trauma.  (R. at 542-546.)  On September 16, 2004, Palau presented to Appalachian on an emergency basis for an acute abscess situation of an odontogenic origin.  (R. at 539.)  Palau complained of pain in her teeth and jaw, and had then current illnesses of hypertension with atherosclerotic vascular disease, osteoarthritis, GERD, subcutaneous lesions of breast with drainage treated with antibiotics, obesity with weight gain over the past two to three years and depression.  (R. at 539.)  Dr. Bruce T. Wilson, M.D., made a preliminary diagnosis of an oral vestibular abscess of an acute nature with gross decayed teeth, and planned on using general anesthesia for extraction of all of Palau's remaining teeth, including excision and drainage of the left vestibule.  (R. at 541.)   Dr. Wilson then extracted all of Palau's remaining maxillary and mandibular dentition, and reported no complications following the surgery.  (R. at 537-38.)   On April 6, 2005, Palau received Emergency Room treatment from Appalachian for complaints of chest pain associated with nausea, shortness of breath, fatigue and sweating.  (R. at 527-36.)

On August 7, 2003, Palau presented to Indian Path Pavilion for mental health treatment.  (R. at 633-39.)  Palau's initial diagnosis consisted of bipolar disorder, manic, panic attacks with agoraphobia, borderline personality disorder, fibromyalgia, migraine headaches, diabetes and asthma.[7]   (R. at 638.)   From August 21, 2003 through October 10, 2003, Palau was admitted for treatment at Indian Path Pavilion.   (R. at 612-631.)   Throughout the treatment, Palau experienced problems including mood instability, decreased sleep, manic episodes, depression, anxiety, panic attacks, racing thoughts, nightmares, frequent flashbacks of past abuse, memory and concentration problems and anhedonia.  (R. at 612-

---

[7] Many of the records during this time period are illegible.  (R. at 638.)

24

631.)  On September 4, 2003, in a clinical update, it was stated that Palau actively participated in the group, and had explored relationships between thoughts and feelings and symptom development.  (R. at 613.)  In addition, it was noted that Palau had developed a personalized crisis plan regarding the steps to be taken toward preventing a crisis.  (R. at 613.)  Upon being discharged, Palau was diagnosed with bipolar disorder, manic, borderline personality disorder, low back pain, fibromyalgia and poor psychological support.  (R. at 628.)  The reason for treatment termination was that her stated goals of improving mood instability and maladaptive trauma had been met.  (R. at 628.)

On March 26, 2007, Dr. Sharon Colton, M.D., reported that Palau had Hidradenitis suppurativa, which caused recurrent boils and abscesses at multiple sites.  (R. at 668.)  Dr. Colton stated that the illness sometimes caused large abscesses that could interfere with movement, especially if located in the axilla and inguinal/perineal area.  (R. at 668.)  Dr. Colton noted that Palau had severe infections on her breasts, which could be worsened with rubbing.  (R. at 668.) Dr. Colton stated that certain physical functions would be impaired depending on the location of the abscess, such as in her axilla, which would create trouble using the arm, or in the groin, which would create trouble with walking.  (R. at 668.)  Dr. Colton opined that Palau's condition was the worst case of Hidradenitis suppurativa that she had ever seen.  (R. at 668.)  She further noted that there was no cure for the problem, and that Palau was required to take antibiotics periodically, and must avoid rubbing her skin.  (R. at 668.)  Dr. Colton concluded that she considered Palau to be disabled and unable to perform even sedentary work.  (R. at 668.)

From June 8, 2006, through May 29, 2007, Palau presented to Cumberland River Comprehensive Care Center for mental health treatment.[8] (R. at 672-711.) From April 20, 2005, through June 18, 2007, Palau presented to Appalachian for many different ailments. (R. at 713-831.) On April 22, 2005, Palau presented to Dr. Vidya Yalamanchi, M.D. at Appalachian and was given a clinical diagnosis of a respiratory abnormality and chest pain. (R. at 828-831.) Dr. Yalamanchi's impressions included a normal myocardial perfusion, probably normal global left ventricular ejection fraction. (R. at 829.) Dr. Yalamanchi noted that clinical correlation was suggested for further evaluation. (R at 829.)

On February 22, 2006, Palau had an x-ray of the right knee, which showed no demonstrable fracture or dislocation; the right hip, which showed a normal study; and the right femur, which showed no bony abnormality. (R. at 757-59.) On this same day, Palau also had an x-ray of the pelvis which showed an intact pelvic innominate, intact SI joints and public symphysis, with both hip joints well articulated. (R. at 824.) Palau also had an x-ray of the lumbar which showed severe narrowing of the L5-S1 disc interspace compatible with degenerative disc disease. (R. at 825.) No lumbar compression fracture was identified. (R. at 825.)

On November 11, 2006, Palau presented to Dr. Nuveed Loqman, M.D., at Appalachian with complaints of pain in the left axilla. (R. at 732.) Dr. Loqman diagnosed Palau with hydradenitis, hypertension, obesity, migraines and psychiatric problems/schizoaffective disorder. (R. at 732-33.)

---

[8] The records from this time period are largely illegible. (R. at 672-711.)

On March 29, 2007, Palau presented to the Emergency Department at Appalachian and was seen by Paul M. Manning, D.O., with complaints of abdominal pain and bloody bowel movements. (R. at 762.) Palau was then admitted to the regular medical floor with consultation for surgical intervention by Dr. Hatem M. El Halabi, M.D. (R. at 762.) Palau then presented to Dr. Halabi for a consultative examination, with chief complaints of abdominal and rectal pain. (R. at 788.) Palau had been examined in the Emergency Room and was found to have thrombosed hemorrhoids, with which Dr. Halbi concurred after the examination, and diagnosed Palau with thrombosed external hemorrhoids and GI bleeding. (R. at 788-89.) An acute abdominal x-ray revealed no evidence of an intestinal obstruction or free air. (R. at 780.) On March 30, 2007, Dr. Halabi performed an examination under anesthesia and excision of thrombosed external hemorrhoids. (R. at 766.)

On February 28, 2007, Dr. Colton completed a Medical Assessment of Ability To Do Work-Related Activities (Mental) in which she opined that Palau had a good ability follow work rules and relate to co-workers; a fair ability to deal with the public, use judgment with the public, interact with supervisors, function independently and maintain attention and concentration; and a poor/none ability to deal with work stresses. (R. at 833-34.) Dr. Colton also found that Palau had a good ability to understand, remember and carry out simple job instructions; a fair ability to understand, remember and carry out detailed, but not complex, job instructions; and a poor/none ability to understand, remember and carry out complex job instructions. (R. at 834.) Dr. Colton further opined that Palau had a fair ability to behave in an emotionally stable manner and relate predictably in social situations, as well as a poor/none ability to maintain personal appearance

27

and demonstrate reliability. (R. at 834.) With regard to other limitations, Dr. Colton opined that Palau has difficulty maintaining hygiene and a diet, in addition to suffering from chronic skin infections and obesity. (R. at 834.) However, Dr. Colton did opine that Palau could manage benefits in her own best interest. (R. at 834.)

On February 28, 2007, Dr. Colton completed a Medical Assessment of Ability To Do Work-Related Activities (Physical) in which she opined that Palau could lift and/or carry items weighing up to 10 pounds occasionally and items weighing up to 20 pounds frequently, stand and/or walk for a total of two hours in an eight-hour workday and sit for a total of six hours in an eight-hour workday. (R. at 835-36.) In addition, it was opined that Palau could occasionally climb, kneel and balance, but never stoop, crouch or crawl. (R. at 836.) Dr. Colton opined that Palau's physical condition would impact her ability to handle and push/pull, but would not affect her ability to reach, feel, see, hear or speak. (R. at 836.) Dr. Colton imposed environmental restrictions with regard to heights, moving machinery, temperature extremes, chemicals, dust, fumes and humidity, while imposing no restrictions with regard to noise or vibration. (R. at 836.)

## III. Analysis

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2008); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the

28

requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 416.920 (2008). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a) (2008).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy the burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2006); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated July 24, 2006, the ALJ denied Palau's claim. (R. at 13-24.) After consideration of the entire record, the ALJ found that Palau had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 18.) The ALJ found that the medical evidence established that Palau had severe impairments, namely post traumatic stress disorder, ("PTSD"), bipolar disorder, generalized anxiety disorder, borderline personality disorder, substance abuse disorder, degenerative disc disease, ("DDD"), of L5-S1, obesity and fibromyalgia, but he found that Palau's medically determinable impairments did not meet or medically equal one of the impairments listed at 20 C.F.R. § Part 404, Subpart P, Appendix 1. (R. at 18-19.) The ALJ found that Palau maintained the residual

functional capacity to perform the requirements of medium work, whereby she could lift up to 50 pounds occasionally, 25 pounds frequently, sit, stand, and/or walk for up to six hours for each activity and no more than occasionally balance. (R. at 22.) Additionally, the ALJ found that Palau was seriously limited but not precluded in her ability to relate to co-workers, relate to the general public, interact with supervisors and deal with stress; however, the ALJ found that Palau had a limited but satisfactory ability to maintain attention and concentration and understand, remember and carry out simple instructions. (R. at 22.) The ALJ determined that Palau was unable to perform any past relevant work. (R. at 26.) Based on Palau's age, education and work history, as well as the testimony of a vocational expert, the ALJ determined that Palau was capable of performing a significant number of jobs existing in the national economy, such as work as a laundry worker or production worker. (R. at 27.) Thus, based on these findings, the ALJ determined that Palau was not under a "disability" as defined by the Act and was not eligible for SSI benefits. (R. at 27.) *See* 20 C.F.R. § 416.920(g) (2008).

Palau argues that the ALJ's residual functional capacity determination is not supported by substantial evidence. (Memorandum in Support of Plaintiff's Motion for Summary Judgment, ("Plaintiff's Brief"), at 9.) Specifically, Palau argues that the substantial evidence of record indicates that she is more mentally limited than found by the ALJ. (Plaintiff's Brief at 10.) In addition, Palau argues that the ALJ's residual functional capacity, ("RFC"), determination is further unsupported as it pertains to her work-related physical limitations. (Plaintiff's Brief at 17.) Lastly, Palau argues that the case should be remanded based on new evidence

submitted to the Appeals Council showing the severity of her condition. (Plaintiff's Brief at 20.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Palau's first argument is that the substantial evidence of record indicates that she is more mentally limited than found by the ALJ. (Plaintiff's Brief at 10.) In essence, Palau contends that there are four medical opinions regarding her work-

related mental limitations, and had the ALJ accorded proper weight to Dr. Bennett's opinion, a finding of disability could have been reached. (Plaintiff's Brief at 10-12.) In addition, Palau argues that Dr. Bennett was the only examining mental health specialist to offer an opinion regarding her work-related mental limitations. (Plaintiff's Brief at 16.) Also, Palau contends that Dr. Stodola, a state agency psychologist, did not have access to the treatment records of Dr. Colton when making his assessment. (Plaintiff's Brief at 16.)

Based on the four medical opinions that Palau received regarding her work-related mental limitations, the undersigned does not find Palau to be more mentally limited than found by the ALJ. On September 18, 2004, Palau presented to Dr. Vollenweider for a consultative examination, with complaints of fibromyalgia, chronic back pain and arthritis. (R. at 339.) Although Palau did not initially complain of mental health ailments, Dr. Vollenweider noted that Palau had complaints of poor sleep, anhedonia and suicidal ideation. (R. at 340.) Palau stated that Dr. Vollenweider that she had difficulty leaving the house, in addition to feeling as though people were watching her. (R. at 340.)

In his overall assessment, Dr. Vollenweider noted no limitations in Palau's hearing, seeing and traveling. (R. at 343.) In terms of mental functioning, Dr. Vollenweider noted that Palau had no limitations understanding, remembering and carrying out simple instructions, but that there would be some significant limitations responding to co-workers, supervisors and work pressures. (R. at 343.)

On March 6, 2005, Palau underwent a consultative examination by Jeanne M. Bennett. (R. at 345.) A mental status examination and behavioral observation

32

revealed that Palau ambulated slowly but independently, with no psychomotor disturbances.  (R. at 348.)  Bennett found that Palau's attention and concentration were good and that she was oriented in all spheres.  (R. at 349.)  It was noted that Palau's speech was fluent and normal with respect to tone and volume, her thoughts were logical, coherent and goal directed and there was no evidence of paranoid ideation or delusional thinking, as well as no indications of a formal thought disorder.  (R. at 350.)  Bennett noted that Palau's general information, as well as global intellectual functioning, were estimated to be in the average range. (R. at 351.)  In addition, Palau's judgment was assessed as fair, she demonstrated limited capacity for insight regarding her behavior and she appeared capable of making decisions for herself independently.  (R. at 351.)

Palau was diagnosed with bipolar disorder, mixed, borderline personality disorder, status post closed head injuries and three MVAs, hypertension, status post myocardial infarction with a GAF of 50.  (R. at 352.)  Bennett opined that Palau's ability to tolerate stress and the pressure of day-to-day employment was affected, with marked limitations noted; her ability to sustain attention and concentration towards the performance of simple repetitive tasks was affected, with moderate limitations noted; and her capacity to respond appropriately to supervision and co-workers in a work setting was affected by the impairment with marked limitations noted.  (R. at 352.)

On March 30, 2005, Ed Stodola, Ph.D., completed an MRFC in which he opined that Palau was mentally unable to function in a competitive work setting with adequate effectiveness, persistence and socialization.  (R. at 399.)  He further opined that Dr. Bennett's findings were consistent with his conclusion and

assigned it great weight in making his assessment. (R. at 399.) On March 30, 2005, Stodola also completed a PRTF in which he noted that Palau had a moderate degree of limitation in her restriction of activities of daily living and with her difficulties in maintaining social functioning; a marked degree of limitation in her difficulties in maintaining concentration, persistence or pace; and one or two degrees of limitation with her episodes of decompensation, each of extended duration. (R. at 401-411.)

On July 6, 2005, Stodola amended his opinion and completed an MRFC in which he opined that Palau's mental allegations alone were partially credible, with restrictions that were severe but not disabling. (R. at 418.) He also observed that functional information indicated that emotional liability may interfere with sustaining attention and completing tasks. (R. at 418.) He additionally noted that Palau drove, shopped, provided for her own self-care, enjoyed a number of activities and performed some routine tasks. (R. at 418.) Stodola opined that Palau was mentally able to understand, remember, and carry out simple and detailed instructions for two hour segments over an eight hour period; relate adequately in object focused settings; and adapt to the changes and pressures of a routine setting. (R. at 418.) Stodola further opined that the severity indicated by Dr. Bennett's opinion regarding stress tolerance and social functioning was not supported by the evidence related to discrete mental allegations, and thus, such an opinion would be assigned little weight. (R. at 418.)

On July 6, 2005, Stodola completed a PRTF in which he noted that Palau had a mild degree of limitation in her restriction of activities of daily living; a moderate degree of limitation in her difficulties in maintaining social functioning,

34

concentration, persistence or pace; and one or two degrees of limitation with her episodes of decompensation, each of extended duration. (R. at 420-432.)

Based on the foregoing evidence, the undersigned does not see any reason to disrupt the findings of the ALJ regarding Palau's work-related mental limitations. Dr. Vollenweider noted that Palau had no limitations understanding, remembering and carrying out simple instructions. (R. at 343.) Although Bennett opined that Palau's ability to tolerate stress and pressure of day-to-day employment, as well as her capacity to respond appropriately to supervision and co-workers in a work setting, was affected with marked limitations noted, Bennett also opined that her ability to sustain attention and concentration towards the performance of simple repetitive tasks was affected with only moderate limitations noted. Additionally, Bennett noted that Palau's general information, as well as global intellectual functioning, were estimated to be in the average range. (R. at 351.) In addition, Palau's judgment was assessed as fair, she demonstrated limited capacity for insight regarding her behavior and she appeared capable of making decisions for herself independently. (R. at 351.)

With regard to Stodola's altered assessment, the undersigned does not find that the ALJ erred in accepting this opinion evidence. Stodola first opined that Palau was mentally unable to function in a competitive work setting with adequate effectiveness, persistence and socialization. (R. at 399.) He further opined that Dr. Bennett's findings were consistent with his conclusion and assigned it great weight in making his assessment. (R. at 399.) However, Stodola re-examined the record several months later, and amended his findings in part based on a telephone conversation with Ms. Earline Napier, M.A., an outpatient therapist who had

treated Palau.  (R. at 435.)  Stodola reported that, based on his conversation with Ms. Napier, Palau's intelligence was estimated to be in the average range.  (R. at 435.)  Additionally, Stodola opined that Palau was able to understand, remember and carryout routine tasks and some more detailed tasks, as evidenced by the fact that she was adept to using the internet to research legal matters related to child molestation laws.  (R. at 435.)  Stodola also noted that Palau had not expressed an interest in employment and had declined to make use of work-related programs offered by the mental health center.  (R. at 435.)

In his amended findings, Stodola stated that Palau was mentally able to understand, remember and carry out simple and detailed instructions for two hour segments over an eight hour period; relate adequately in object focused settings; and adapt to the changes and pressures of a routine setting.  (R. at 418.)  Stodola further opined that the severity indicated by Dr. Bennett's opinion regarding stress tolerance and social functioning was not supported by the evidence related to discrete mental allegations, and thus, such an opinion was assigned little weight.  (R. at 418.)

Therefore, based on the opinion evidence as presented, the undersigned finds that the ALJ was justified in according great weight to the psychological treatment evidence which supports no more than overall moderate limitations.  (R. at 25.)  In addition, the ALJ even gave Palau the benefit of the doubt in finding greater psychological limitations than found by the state agency psychologist.  (R. at 25.)  The ALJ found that Palau has a "seriously limited but not precluded ability" to relate to coworkers, relate to the general public, interact with supervisors and deal with stress, as well as a limited but satisfactory ability to maintain attention and

36

concentration and understand, remember and carryout simple instructions. (R. at 25.) Thus, the ALJ placed greater psychological limitations than those determined by the state agency psychologist.

Palau additionally argues that Stodola did not have access to the treatment records of Dr. Colton, as well as several other medical facilities, when making his assessment. First the undersigned would like to note that an overwhelming majority of the medical treatment notes to which Palau cites precede her alleged onset date of March 17, 2004, and will thus not be considered. With regard to Dr. Colton's February 28, 2007, Medical Assessment of Ability To Do Work-Related Activities (Mental), the undersigned will address the significance of this report in the final argument.

Palau's second argument is that the ALJ's RFC determination is further unsupported as it pertains to her work-related physical limitations. (Plaintiff's Brief at 17.) Specifically, Palau contends that there is substantial evidence to support her allegations of disabling pain and symptoms. (Plaintiff's Brief at 19.) Additionally, Palau asserts that, although the state agency physician opined that she could perform medium work, such an assessment was made without access to a significant amount of the evidence of record. (Plaintiff's Brief at 19.)

The undersigned is of the opinion that, based on the medical evidence of record at the time of the ALJ's decision relating to Palau's work-related physical limitations, the ALJ's findings should not be disturbed.

On September 18, 2004, Palau presented to Dr. Vollenweider for a consultative examination, with complaints of fibromyalgia, chronic back pain and arthritis. (R. at 339.) In his overall assessment, Dr. Vollenweider noted no limitations in Palau's hearing, seeing and traveling. (R. at 343.) Dr. Vollenweider also stated that Palau's symptoms of carpal tunnel syndrome would limit her ability to lift and carry objects. (R. at 343.) Dr. Vollenweider noted, with regard to sitting, standing and walking, that Palau would have some mild difficulty secondary to lumbar spine pain. (R. at 343.)

On April 27, 2004, Palau presented to her treating physician, Dr. Colton, for a routine follow-up after being in the hospital. (R. at. 464-65.) Palau complained of many ailments, including pain in her left temple, infected cysts, fibromyalgia and chronic pain in her back and neck. (R. at 464.) Palau was diagnosed with multiple boils, fibromyalgia, migraine headaches, bipolar disorder, chronic neck pain, asthma, GERD and ASHD. (R. at 465.)

On July 28, 2004, Palau presented to Dr. Colton for a comprehensive medical examination. (R. at 456.) A review of systems revealed reports of chest pain, which often resulted from panic, coughing, heartburn, constipation, neck and back pain, cysts on her breasts, restlessness and reports of breaking out in cold sweats. (R. at 456.) Among her observations, Dr. Colton noted that Palau was a well-developed, morbidly obese white female in no acute distress. (R. at 458.) Dr. Colton made further notations that Palau had some scarring on her skin, normal hair, nails, vision and hearing, a clear nose and mouth, no nipple abnormality, a regular heart rhythm, clear lungs to auscultation and percussion, an obese abdomen with generalized mild tenderness, normal bowel sounds, normal gait and station,

38

no lymphadenopathy in cervical, axillary or injuinal areas, no amputations or deformities and a normal mood and affect. (R. at 458-59.) Dr. Colton made no diagnoses regarding any of her problems, however, she did make the following therapeutic recommendations: regarding her bipolar disorder, PTSD or anxiety, Dr. Colton recommended that Palau see a psychiatrist; regarding her asthma and tobacco use disorder, Dr. Colton encouraged Palau to cease smoking.; regarding her GERD, Dr. Colton recommended the continued use of Prilosec; regarding her ASHD, hyperlipidemia and glucose intolerance, Dr. Colton stressed the importance of moderation in sodium intake, saturated fat and cholesterol and caloric balance; regarding her hidradenitis supperrativa, Dr. Colton recommended Keflex for 10 days with two refills; and regarding her dec vision, Dr. Colton encouraged an appointment with an eye care provider. (R. at 459-60.)

From August 24, 2004, to November 8, 2005, Palau presented many times to Dr. Colton. (R. at 437-54, 575-82.) During these visits, Dr. Colton assessed Palau's major problems as including influenza, tobacco use disorder, fibromyalgia, migraine headaches, bipolar disorder, chronic neck pain, asthma, GERD, hyperlipidemia, glucose intolerance, low back pain, sacroiliac joint dysfunction, constipation, dermatitis, left breast pain, shortness of breath, chest pain, hypertension, anxiety and right knee pain. (R. at 437-54, 575-82.)

On March 11, 2005, Palau underwent a consultative examination by Dr. Burns for complaints of fibromyalgia causing pain in the back, neck, knees, foot, hand, hips and ankles, as well as bipolar disorder and PTSD. (R. at 353.) Dr. Burns opined that, based on the medical findings, Palau had the ability to perform activities involving sitting, standing, moving about, lifting, carrying, handling

39

objects, hearing, seeing, speaking and traveling.  (R. at 355.)  Dr. Burns noted that her physical examination and orthopedic examination were within normal limits. (R. at 355.)  Dr. Burns further noted that Palau had normal gait and station without evidence of motor dysfunction, sensory loss or reflex abnormalities.  (R. at 355.) He also noted that Palau did not use a cane or assistive device for ambulation, she had the ability to hear and understand normal conversational speech, and had normal gross manipulation and grip strength.  (R. at 355.)

On May 19, 2005, Palau presented to Dr. Dahhan for an x-ray of the hip and knee.  (R. at 387.)  The x-ray of Palau's hip showed minimal degenerative changes of the left hip with no other abnormalities, while the x-ray of the knee was negative.  (R. at 387.)

On June 8, 2005, Dr. Ramsey completed a PRFC in which he opined that Palau could occasionally lift and/or carry a maximum of 50 pounds; frequently lift and/or carry a maximum of 25 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; and that she was unlimited in her ability to push and/or pull.  (R. at 389.) Dr. Ramsey imposed no postural, manipulative, visual, communicative or environmental limitations.  (R. at 390-92.)  Dr. Ramsey opined that Palau's allegations of multiple areas of musculoskeletal pain should only be given partial credibility based on the objective clinical findings.  (R. at 393.)

In rendering this opinion, Dr. Ramsey noted that Palau had a diagnosis of fibromyalgia with pain in her back, neck, foot, hand, hip and angle.  (R. at 389.) Dr. Ramsey further noted that x-rays in Palau's file showed mild osteophytes in the

40

dorsal spine area with no fractures, and her lumbar spine was normal, except for a questionable narrowing of the L5-S1 disc space. (R. at 389.) Dr. Ramsey additionally noted that Palau was neurologically intact and straight leg raising sign was negative bilaterally. (R. at 390.) Palau's gait was described as normal, although she alleged prolonged sitting, standing, bending, twisting, turning, stooping and squatting as exacerbating the pain. (R. at 390.)

On March 6, 2006, Palau had an x-ray of her lumbar spine which revealed a severe narrowing of the L5-S1 disc interspace, compatible with degenerative disc disease. (R. at 580.) No lumbar compression fracture was identified. (R. at 580.)

Palau received treatment from several other health facilities, including Mountain Comprehensive Health Corporation, Carilion Family Medicine and Harlan Appalachian Regional Healthcare, Inc., citing a range of complaints including MRSA, skin infections, high triglyceride, hypertension, migraine headaches, bipolar affective disorder, recurrent folliculitis, arthritis, chronic pain syndrome, neck pain radiating to the left arm, obesity, tobacco use, hyperthyroidism, diabetes, low hygiene, COPD, heart disease, tobacco use, swelling on inner upper thigh, carbuncle, back pain, fatigue, pain all over her body, fibromyalgia, hidradenitis, obesity, cellulitis, abscess under her right arm and boils underneath her breasts. (R. at 466-483, 574, 491-526.)

It is clear that Dr. Ramsey's assessment, in which he opined that Palau could perform medium work, was based on substantial evidence. Upon making his assessment, Dr. Ramsey had access to the treatment notes of Dr. Vollenweider, Dr. Colton, Dr. Burns and Dr. Dahhan. None of these treating physicians made significant findings that would disrupt the basis of Dr. Ramsey's assessment that

41

Palau could perform medium work. Although Palau argues that Dr. Ramsey did not have access to certain records made after his assessment was performed, such records are based significantly on Palau's subjective complaints from multiple visits to medical facilities. Such evidence would not likely change Dr. Ramsey's opinion, and thus the ALJ was proper in relying on his assessment.

Palau's final argument is that the case should be remanded based on new evidence submitted to the Appeals Council showing the severity of her condition. (Plaintiff's Brief at 20.) Specifically, Palau relies on Dr. Colton's medical assessment. (Plaintiff's Brief at 20.)

In this case, after the ALJ hearing, Palau's counsel submitted additional records to the Appeals Council. (R. at 665-836.) The Appeals Council found no reason under the rules to review the ALJ's decision; thus, the ALJ's decision was affirmed and Palau's request for review was denied. (R. at 5-9.) The Appeals Council specifically explained that it considered Dr. Colton's Mental and Physical Residual Function report dated February 28, 2007, and her report dated March 26, 2007; records from Cumberland River Comprehensive Care Center dated June 8, 2006, through May 29, 2007; and records from Harlan Appalachian Regional Healthcare Inc., dated June 8, 2006, to May 29, 2007. (R. at 7.) The Appeals Council noted that "this new information supports the finding of disability beginning January 2007 and not thereafter," and "[t]herefore, it does not affect the decision about whether [Palau was] disabled beginning on or before July 24, 2006. (R. at 7.) In addition, the Appeals Council determined that the information did "not provide a basis for changing the [ALJ's] decision." (R. at 7.)

Palau argues that the case should be remanded based on new evidence pursuant to 42 U.S.C. § 405(g) sentence six, which states:

> [this] court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

According to the Supreme Court, "[t]he sixth sentence of § 405(g) plainly describes an entirely different kind of remand [than the fourth sentence], appropriate when the district court learns of evidence not in existence or available to the claimant at the time of the administrative proceeding that might have changed the outcome of that proceeding." *Sullivan v. Finkelstein*, 496 U.S. 617, 626 (1990); *see also Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991). Thus, in order for the court to properly grant a remand under sentence six of § 405(g), the additional evidence must be new, material and relate to the period on or before the date of the ALJ's decision. *See Wilkins*, 953 F.2d at 95-96. For the purposes of this analysis, evidence is considered new "if it is not duplicative or cumulative." *See Wilkins*, 953 F.2d at 96. Furthermore, as stated in *Wilkins*, "[e]vidence is material if there is a reasonable possibility that the new evidence would have changed the outcome." 953 F.2d at 96; *see also Borders,* F.2d at 956 (4th Cir. 1985).

Here, without addressing whether the additional evidence was new, material and related to the relevant time period, it is clear that Dr. Colton's report, as well as the evidence from other medical facilities, were presented to the Appeals Council and thus incorporated into the record. As such, this court is not permitted to remand pursuant to sentence six because the evidence was properly made a part of the record by the Appeals Council. *See Edwards*, 2008 U.S. Dist. LEXIS at *23; *Ingram*, 496 F.3d at 1269; *see also Nelson v. Sullivan*, 966 F.2d 363, 366 n.5 (8th

43

Cir. 1992) ("[O]nce the evidence is submitted to the Appeals Council it becomes part of the record, thus it would not make sense to require [the claimant] to present good cause for failing to make it part of a prior proceeding's record.")

After review, the undersigned finds that the medical evaluation performed by Dr. Colton was considered and rejected by the Appeals Council, and was thus made part of the record. As such, the court is not permitted to remand based on the standard set forth in 42 U.S.C. § 405(g) sentence six and *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985) because sentence six applies specifically to evidence not incorporated into the record by either the ALJ or the Appeals Council. *Edwards v. Astrue*, 2008 U.S. Dist. LEXIS 13625, *23 (W.D. Va. February 20, 2008).

## V. Conclusion

For these reasons discussed above, I will sustain the Commissioner's motion for summary judgment and decision to deny benefits, and I will overrule Simmons's motion for summary judgment.

An appropriate order will be entered.

DATED: This 8th day of June, 2009.

s/ Glen M. Williams
SENIOR UNITED STATES DISTRICT JUDGE

-44-